[Crim. No. 22443. Feb. 6, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
WAYNE A. SHAW, Defendant and Appellant.

[Crim. No. 22365. Feb. 6, 1984.]

In re WAYNE A. SHAW on Habeas Corpus.

536

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Mark Fogelman, Deputy State Public Defender, for Defendant and Appellant and Petitioner.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Ann K. Jensen, Thomas A. Brady and Linda Ludlow, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**RICHARDSON, J.**—Defendant Wayne A. Shaw appeals from a judgment revoking probation. After a guilty plea to a charge of robbery (Pen. Code, § 211), defendant was sentenced on February 25, 1980, to a prison term of three years. Execution of sentence was suspended and probation was granted on condition that defendant enroll in an alcohol treatment program at Liberation House in San Francisco for a minimum of six months. On April 25, 1980, after a hearing, defendant's probation was revoked because of his

arrest on a second San Francisco robbery charge stemming from an incident on March 4, 1980, and execution of sentence was ordered. The subsequent prosecution of the second charge was dismissed after trial commenced.

Defendant has appealed from the judgment revoking his probation and simultaneously he has filed with us an original petition for writ of habeas corpus. He asserts that he was denied the effective assistance of counsel and that the evidence presented at the hearing was insufficient to support the revocation of probation. We issued an order to show cause, and after oral argument referred the matter to a referee for further proceedings relating to allegations of counsel incompetency in the habeas corpus petition. In this connection, we have been greatly assisted by the services of an experienced and careful retired trial judge as our referee. Following issuance of the referee's report, the parties submitted additional briefing. ▮ We will conclude that defendant was denied his right to effective counsel because of his attorney's failure to investigate and present potentially meritorious alibi and mistaken identity defenses.

The following facts were established at the preliminary hearing on the second robbery charge. On March 4, 1980, Rebhi Ayesh was working at a food market on Fillmore Street in San Francisco. He telephoned his mother, Nehia, asking her to bring him $300. Rebhi testified that his mother arrived at the market at approximately 10 to 15 minutes after 10 a.m., while Nehia placed the time that she arrived at approximately 10:30 a.m. A few minutes before her arrival, two men entered the store, made a small purchase, and remained, examining some magazines. Three or four minutes after entering the store, Nehia attempted to give the $300 to Rebhi, who told her to wait while he gave an order to a salesman who was with Rebhi in the rear of the market. Rebhi soon heard a noise, and observed his mother on the floor and the two men departing. He chased the men north on Fillmore until they separated and then pursued the taller of the two men towards Steiner Street. In the meantime, the police in a nearby patrol car, alerted to the fact that Rebhi was running down the street carrying a gun, caught up with him at Steiner and Fulton. The police and Rebhi then proceeded to Alamo Square, a park nearby, where Rebhi immediately identified defendant who was wearing a yellow jacket with a zipper and a red hat. Rebhi had not previously described the robber to the officers. When arrested, defendant was observed to be breathing rapidly and his "face was covered with water." The $300 was not found on his person.

At the preliminary hearing, after being questioned in defendant's absence, both Ayeshes identified defendant as the robber when he was brought into the courtroom for their viewing.

At the probation revocation hearing and without objection, the prosecutor presented the preliminary hearing transcript and an unsigned statement purporting to be a report of the salesman declaring he had arrived at the store between 10:15 and 10:30 a.m. and had been there for approximately 20 to 30 minutes when he observed the attack on Nehia. No defense witnesses testified.

From the time of his arrest and throughout these proceedings, defendant has asserted his innocence. On March 4, 1980, he resided at Liberation House on Divisadero and Eddy Streets. After leaving the house between 9:45 and 10 a.m. he walked to a food stamp distribution center at California and Divisadero Streets where he obtained food stamps shortly after 10 a.m. He then returned, walking past Liberation House and its office at Divisadero and O'Farrell, on his way to a bank at Hayes Street. Finding the bank closed, he proceeded towards his wife's office at Van Ness near Hayes where he knew that a bank branch was open, and, on the way, stopped to smoke in Alamo Square where he was arrested.

Before the preliminary hearing, defendant's probation officer spoke with residents of Liberation House who confirmed the time of defendant's departure from the residence. One occupant, Mr. Robinson, recalled having seen defendant pass the office between 10:15 and 10:25 a.m., later estimating that it was between 10:10 and 10:30 a.m. Written copies of the Robinson statement were given to defendant's counsel and the prosecutor. The probation officer also told defense counsel that she had previously observed that defendant perspired easily. Defendant made several unsuccessful requests to see his counsel. Although the attorney was asked to do so, he interviewed neither Robinson nor the salesman whose statement was introduced at the revocation hearing.

In combination, the affidavits in support of the habeas corpus petition and the testimony elicited at the evidentiary hearing reveal several facts in corroboration of defendant's alibi defense and mistaken identity claim. The food stamp office opened at 10 a.m. on March 4; its records confirm that defendant did obtain food stamps on that date; the existence of defendant's bank account was corroborated, as was the place of his wife's employment; Robinson reaffirmed the time and place of his sighting of defendant on the day of the crime; the police booking slip showed that defendant had a knit cap when arrested, although testimony at the preliminary hearing indicated that the robber wore a beaked "sports hat"; the salesman testified that he described the robber to the investigating officer as wearing a dark coat, pants and billed hat, although this information was not included in the statement presented at the revocation hearing; the salesman later described the coat as possibly navy blue or green, or at the lightest, a tan color similar to

that of a manila envelope; and letters written by defendant to his probation officer and his counsel from the time of his arrest confirmed the consistency of his allegations.

Defendant's specific claims of incompetency include counsel's failure to (1) investigate an alibi defense before the preliminary hearing, (2) object to admission of the preliminary hearing transcript at the revocation hearing, (3) present any evidence on his behalf, and (4) assure that the interpreter used during the Ayeshes' testimony rendered an accurate translation.

The referee at the evidentiary proceeding found "that a reasonably competent attorney acting as a diligent advocate would have personally or through a competent investigator, interview[ed] Mr. Robinson in depth." The basis of this finding was defendant's continued assertions of innocence, the fact that Robinson could have supported an alibi defense at the revocation proceeding, and the potential for further corroboration through additional investigation at Liberation House.

The referee further concluded, however, that counsel's failure to interview Robinson "did not deprive the defendant of a potentially meritorious defense" because "The facts brought forth would not have changed the nature of the defense. It would at most be *arguable* but not meritorious" (italics added) and its effect "would be dubious at best."

As to the salesman, the referee found that "There was a possibility that the salesman could definitely state that the defendant was not the person who committed the assault. The inability of a witness to identify a defendant does not preclude a negative identification. In this connection, [counsel] failed to act in a manner expected of a reasonably competent attorney acting as a diligent advocate. The salesman should have been interviewed in depth." Nonetheless, again the referee concluded that because of various uncertainties in the witness' testimony, and "considering all the evidence," the failure to interview the salesman "did not result in the loss of a potentially meritorious defense."

■ In finding that defense counsel failed to act with reasonable competence, the referee properly measured counsel's performance against the standards established by us in *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], in which we required that "appellant must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (P. 425.) ■ Thereafter, in the context of a contention that counsel had withdrawn a

defense, we observed "It is sufficient for the present purpose to observe that the defense was potentially meritorious, and that petitioner was denied an adjudication on the matter because of his counsel's inadequate factual and legal preparation." (*In re Hall* (1981) 30 Cal.3d 408, 434 [179 Cal.Rptr. 223, 637 P.2d 690].)

■ Although the referee's findings of fact, if supported by credible evidence, are entitled to great weight, we may reach an independent conclusion after our review of the record. (*Hall, supra,* at p. 416.)

■ We concur with the referee's assessment that in critical areas counsel's actions were not consistent with those of a diligent advocate. In addition, after reviewing the record as a whole, and resolving some reasonable doubts in defendant's favor, we conclude that counsel's incompetence deprived defendant of a potentially meritorious defense.

■ In *People v. Farley* (1979) 90 Cal.App.3d 851, 865 [153 Cal.Rptr. 695], the Court of Appeal stressed that "defendant is denied the effective assistance of counsel if, by reason of counsel's failure to perform the obligations imposed upon him, defendant is deprived of an *adjudication* of a crucial or potentially meritorious defense." (Cited with approval in *In re Hall, supra,* 30 Cal.3d at p. 434.) Moreover, we have added: "A crucial defense is not necessarily one which, if presented, 'would result inexorably in a defendant's acquittal.' [Citations.]" (*People v. Pope, supra,* 23 Cal.3d at p. 425, fn. 15.)

■ The defense here was alibi; defendant claims that he was elsewhere and that the evidence supports his contention that he could not have been in the market at the time the crime was committed. As the referee found, by failing to inquire into the factual basis for his client's claims, and by failing to present any defense, counsel effectively chose to enter a "slow plea" of guilty at the revocation proceeding. The prosecution knew in advance of the potential alibi defense, at least in part, from information given by defendant's probation officer. Defendant gained no apparent benefit from the effective concession of revocation: the underlying criminal charges were not dismissed until later because of the unrelated disappearance of Rebhi Ayesh, and there was no "deal" made regarding future sentencing on those charges.

■ In *People v. Frierson* (1979) 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587], counsel failed to investigate a diminished capacity defense, although he ultimately attempted to raise such a defense. We explained "By his inaction, deliberate or otherwise, counsel deprived himself of the reasonable bases upon which to reach *informed* tactical and strategic trial de-

cisions . . . . [¶] [E]ven tactical decisions may demonstrate incompetence if made without the benefit of 'substantial factual inquiry.'" (P. 163.)

■ Applying the above principles, we conclude that while counsel's omissions might have been based on otherwise proper tactical considerations, nevertheless counsel acted without adequately investigating his client's defense. His decisions relative to the tactics available therefore were not "informed" decisions within our *Frierson* rationale, and so effectively deprived defendant of the presentation of a potentially meritorious defense. While respectfully disagreeing with his ultimate conclusion, we concur with the referee's characterization of the alibi defense as "arguable." As indicated, the record reveals substantial corroboration of the alibi defense which, although it might not have prevailed, at least had the *potential* of prevailing and was sufficient to warrant an adjudication. Under all of the circumstances, we therefore conclude that counsel failed to meet the standard enunciated in *People* v. *Pope, supra,* 23 Cal.3d 412.

Because our foregoing conclusion is dispositive of the issues before us, we need not consider defendant's other claims, including his assertion that counsel's failure to request a lineup before the preliminary examination and his choice instead to utilize a different procedure (see *People* v. *Green* (1979) 95 Cal.App.3d 991 [157 Cal.Rptr. 520]), also constituted ineffective assistance of counsel.

■ For the court's benefit in the event of a rehearing of the revocation proceedings, we touch briefly on the duties of an interpreter.

We fully agree with the referee that in the matter before us there was no showing that counsel was necessarily inadequate for failing to object to the translations at issue. ■ An interpreter must render a true translation of the questions posed and answers given. (Evid. Code, § 751; *People* v. *Wong Ah Bang* (1884) 65 Cal. 305, 306 [4 P. 19].) ■ Here, the interpreter frequently reverted to the third person in his translation, and questions were often addressed to him rather than the witness. In *People* v. *Jackson* (1959) 53 Cal.2d 89, 95 [346 P.2d 389], we considered the interpreter's use of the third person and his apparent editing, explaining or interpolation of questions and answers. We stressed: "Of course, it is the duty of an interpreter *to interpret and report to the court every statement as made by the witness.*" (See also Annots. (1948) 172 A.L.R. 923; (1971) 36 A.L.R.3d 276.) As a recent Court of Appeal decision aptly explained: "When bilingual courtroom dialog is exchanged through an interpreter, literal translation should be exacted of him, without paraphrasing, because of undetectable differences which may exist between the words spoken and his understanding of

their message." (*People* v. *Chavez* (1981) 124 Cal.App.3d 215, 225 [177 Cal.Rptr. 306].)

Counsel and courts are equally cautioned to assure accurate interpretation through the use of direct questions to and answers from the witness requiring verbatim translation in order to avoid the pitfalls of paraphrasing leading to distortion or inaccuracies. However, not every refusal by counsel to object to such translations necessarily amounts to the constitutionally inadequate assistance of counsel. In the present case, as in *Jackson,* although the third person form was used, we fully agree with the referee that the failure to object did not amount to such a constitutional deficiency. We note that defendant has not shown any reasonable basis for concluding he was prejudiced thereby.

For the reasons stated above, the petition for writ of habeas corpus is granted. The judgment revoking probation is vacated and petitioner is remanded to the Superior Court in and for the County of San Francisco. The appeal from the judgment revoking probation is dismissed as moot.

Bird, C. J., Mosk, J., Kaus, J., and Reynoso, J., concurred.

**BROUSSARD, J.**—I concur in the judgment of my colleagues. I write separately, however, to discuss a very troubling issue which the majority has chosen not to consider.

Before determining the competency of defense counsel's performance, we must understand the context in which he was required to perform. Defendant Shaw had been charged with a robbery alleged to have been committed while he was on probation for another robbery offense. Pursuant to the usual practice followed by the San Francisco Superior Court, the defendant was forced to appear at a probation revocation proceeding prior to trial or disposition of the underlying robbery charge. And it is this procedure—the routine practice of requiring criminal defendants to face probation revocation proceedings *prior* to trial or disposition of the underlying charges—which clearly engendered many of the problems in this case.

The issue is hardly a novel one for this court. We first recognized the problems inherent in permitting revocation proceedings to precede trial in *People* v. *Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024]. In *Coleman,* we began by noting the clear constitutional dilemma confronting probationers who face such pretrial revocation proceedings and undertook a lengthy discussion of the constitutional rights which are threatened by such a procedure. We stated that "[w]hen a pending or potential criminal charge forms the basis of an alleged violation of a condition of

probation, a probationer who can explain his actions only by jeopardizing his chances of acquittal at a subsequent criminal trial may understandably feel that his opportunity to be heard is more illusory than real and that he is being deprived of his liberty without one of the essential elements of rudimentary fairness—a meaningful chance to speak on his own behalf. Moreover, the deterrent effect of concurrent criminal liability also serves to defeat the intelligent and just exercise of the court's broad discretion in a probation revocation proceeding by impairing the accuracy and restricting the scope of the fact finding process . . . . [M]itigating evidence [presented by the probationer] is just what is most likely to be withheld from the court by virtue of the probationer's fear of self-incrimination, since mitigating evidence often involves damaging factual admissions coupled with more or less compelling moral excuses." (P. 874.)

We found that permitting testimony from a revocation proceeding to be used at a subsequent trial created an intolerable tension between a probationer's fundamental right to due process at the revocation hearing and the equally fundamental right to remain silent at trial. (*Id.* at p. 878.) We therefore held that testimony offered by a probationer at a revocation hearing should be inadmissible in a subsequent criminal trial. We believed that this would eliminate the intolerable situation in which the People, by moving to revoke a defendant's probation prior to trial, could seek to force the probationer into self-incriminating statements at the revocation hearing.

At the time of our *Coleman* decision, however, we noted additional problems which may arise when a revocation hearing precedes trial: "Because of the inapplicability of certain evidentiary rules and the lower standard of proof obtaining at a probation revocation hearing, the People are generally more likely to achieve a probationer's incarceration through the probation revocation process than through the new prosecution and conviction. When a probationer is deterred from testifying at his revocation hearing by fears of self-incrimination at his subsequent trial, the People's chances of securing his incarceration through the revocation proceeding are further enhanced. And if a probationer does successfully fight revocation by testifying at the hearing, the People's chances of securing his conviction of a new offence will have been improved by the probationer's having been forced, in effect, to be one of the prosecution's principal witnesses in its case in chief at his trial." (*Coleman, supra,* 13 Cal.3d at pp. 876-877, fns. omitted.)

Regardless of whether a probationer succeeds or fails in his efforts to oppose revocation, he is effectively required to reveal much of the theory and substance of his defense at such a hearing—either through his own testimony, the testimony of witnesses who appear on his behalf, or through

his attorney's cross-examination of the People's witnesses.[1] In essence, a procedure in which a revocation hearing invariably precedes trial denies a probationer awaiting trial the same protections under the laws of criminal discovery that are afforded to a defendant who is not a probationer, and hence does not face such a hearing. Although the majority in *Coleman* recognized the substantial burden imposed by such a procedure, our ruling has apparently done little to remedy the situation.

When we decided *Coleman,* we hoped that our newly fashioned exclusionary rule would suffice to protect the rights of probationers.[2] Even then, however, we admonished courts and prosecutors that the more desirable method would be to hold probation revocation hearings *after* disposition of the underlying criminal charges. (*Coleman, supra,* at p. 896.) Unfortunately, our admonitions have largely been ignored by the San Francisco Superior Court, the jurisdiction in which the instant case arose. Apparently, the San Francisco courts have followed a *routine* policy of setting virtually all probation revocation hearings prior to trial, without exercising discretion in each case.[3] Such a policy directly contravenes the spirit of our *Coleman* ruling as well as this court's explicit reaffirmation of its preference for posttrial revocation proceedings set forth in *People* v. *Belleci* (1979) 24 Cal.3d 879, 888, footnote 7 [157 Cal.Rptr. 503, 598 P.2d 473].

---

[1]For example, defense counsel in the instant case stated repeatedly during the referee's hearing that one of his principal reasons for not conducting a more thorough investigation or presenting more evidence at the revocation hearing was his concern about tipping his hand to the prosecution before trial. While this was not an adequate explanation for his overall performance, it clearly highlights one of the major problems spawned by our *Coleman* ruling.

[2]As I pointed, however, out in my dissent in *People* v. *Jasper* (1983) 33 Cal.3d 931, 942, 944 [191 Cal.Rptr. 648, 663 P.2d 206], "the majority fail to recognize that *Coleman*'s exclusionary rule will be seriously questioned in a future case because the 'truth in evidence' provision of the recently passed Proposition 8, now embodied in section 28, subdivision (d), article I of the state Constitution, has purportedly 'repealed' such state-imposed exclusionary rules (an issue which we carefully avoid deciding today), thus rendering the majority opinion in this case useless in the immediate future."

[3]Only a year after our *Coleman* decision, the Court of Appeal felt compelled to note this "routine" practice in *People* v. *Sharp* (1976) 58 Cal.App.3d 126, 130 [129 Cal.Rptr. 476], where appellant probationer presented significant statistical evidence to that effect. Moreover, during the referee's hearing in the instant case, several of the most respected criminal defense attorneys in the Bay Area were called to testify. All of them stated that the routine practice of holding revocation proceedings prior to trial continues to this day in San Francisco Superior Court and that motions for continuances are virtually futile. As one might expect, they also expounded on the dilemma which this creates for defense attorneys and their clients. (See e.g., hearing testimony of Ephraim Margolin.) In addition, judges from San Francisco County who testified at the hearing, including the judge who presided in this case, acknowledged that motions to continue revocation proceedings until after trial are only "infrequently granted." Further, the district attorney who prosecuted Shaw, Alfred Chiantelli, stated unequivocally that, "The policy is that motions to revoke are held *prior* to time of trial . . . it's practiced regularly in the Municipal Court and Superior Court." (Italics added.)

We recently had the opportunity in *People* v. *Jasper, supra,* 33 Cal.3d 931 to strengthen the *Coleman* rule and to eliminate the enormous and unjust burden which this procedure imposes on defendants and their attorneys alike. Unfortunately, a majority chose not to exercise our supervisory powers to require a change in the existing practice, and left the scheduling of probation revocation hearings "in the reasonable discretion of the trial court." (*People* v. *Jasper, supra,* 33 Cal.3d at p. 935.)

Defense counsel in this case was a highly experienced and respected attorney who has practiced criminal law for more than 20 years, most of them in San Francisco County. He clearly was aware that the courts of this county routinely hold revocation proceedings prior to trial. It is equally clear from the record of the referee's hearing that his knowledge of this unfortunate practice significantly impacted on his handling of the matter. Thus, while that knowledge did not excuse his performance, it is conceivable that if the *Coleman/Jasper* rules were otherwise, counsel would have performed differently. This case therefore presents yet another example of how *Coleman* and *Jasper* foster undesirable results, and provides a sound reason why their approach should be abandoned.

As I suggested in my dissent in *Jasper,* we should exercise our supervisory powers to impose a judicial rule of procedure requiring that absent a showing of good cause by the prosecutor or waiver by the probationer, revocation proceedings should be held *after* trial or disposition of the underlying charges. (See *People* v. *Jasper, supra,* 33 Cal.3d at p. 942 (dis. opn. of Broussard, J.).) This rule would place the burden for changing that procedure where it belongs. To the extent that it would also prevent the kind of regrettable situation which the instant case presents—one which seriously impairs the fundamental rights of criminal defendants and limits the effectiveness of attorneys who represent them—the criminal justice system as a whole would benefit.

Bird, C. J., and Reynoso, J., concurred.

Respondent's petition for a rehearing was denied March 15, 1984.